UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRANCIS SANTANA DE LA ROSA,
Petitioner,

v.

TODD BLANCHE, United States Attorney General,
Respondent.

23 Civ. 11126 (DEH)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

DALE E. HO, United States District Judge:

Petitioner Francis Santana de la Rosa ("Petitioner" or "Santana") seeks review of a decision of the Board of Immigration Appeals ("BIA") affirming his removal order, in which the BIA concluded that he had not derived United States citizenship from his mother. ECF No. 1. The issue presented in this case is whether Santana automatically obtained U.S. citizenship pursuant to 8 U.S.C. § 1431(a) when his mother, Luz-Maria de la Rosa, became a naturalized citizen on March 12, 2003. There is no dispute that, at the time his mother naturalized, Santana was under the age of eighteen, resided in the United States, and was in his mother's physical custody from that time until he turned eighteen on June 4, 2003. The only question is whether Santana—who, although living with his mother, was subject to a court-approved voluntary foster care placement agreement at the time—was in her "legal custody" as 8 U.S.C. § 1431(a) requires.

The parties, including Respondent Attorney General Todd Blanche ("Respondent" or the "Government"), stipulated to trial submitted on a written record with closing arguments. *See* ECF No. 83.[1] Closing arguments were held on July 1, 2026. The Court hereby issues its Findings of

[1] The parties also stipulated "to the admission of all proposed exhibits except those exhibits for which the Court has reserved decision on Petitioner's pending motions in limine, specifically, proposed exhibits DX-10, DX-11, and DX-13." ECF No. 83. The Court has considered Plaintiff's

Fact and Conclusions of Law, reaching the ultimate determination that Santana was in his mother's legal custody when she naturalized and is therefore a U.S. citizen.

## FINDINGS OF FACT

### I. Santana's Early Life

1. Santana was born in Santo Domingo, Dominican Republic, on June 4, 1985. Stip. Facts ¶ 1; JX-1_001 (Petitioner's Birth Certificate).[2] His mother is Luz-Maria de la Rosa (*a.k.a.* Luz-Maria Torres, referred to herein as "Ms. de la Rosa" or "Santana's mother"). Stip. Facts ¶¶ 2-3; JX-1_001 (Petitioner's Birth Certificate).

2. Santana and his mother entered the United States on B-2 nonimmigrant visas in 1992. Stip. Facts ¶¶ 5, 6; JX-2_001 (Petitioner's Visa); DX-8_002 (Ms. de la Rosa's Adjustment Application); *see also* 8 U.S.C. § 1101(a)(15)(B).

3. After their entry, Santana, his mother, and his siblings (Ms. de la Rosa's other children) began residing in New York. *See* JX-5_003 (Ms. De la Rosa's Naturalization Application) (listing current New York residence as beginning in 1995).

4. In August 1994, Santana was admitted to Elmhurst Hospital Center after experiencing suicidal ideations and possible auditory hallucinations. Stip. Facts ¶ 8; DX-12_004 (Green Chimneys Intake). He was diagnosed with Post Traumatic Stress Disorder and Psychotic

objections to these exhibits, which are **OVERRULED**, as the documents in question are either self-authenticating or have been established as authentic, and, to the extent that they could be considered hearsay, fall within an established hearsay exception. *See* Resp't's Resp. to Pl.'s Mot. in Limine at 15, ECF No. 59. Accordingly, all exhibits listed in the parties' Joint Pretrial Order ("JPTO") at 11-14, ECF No. 55, are deemed admitted.

[2] "Stip. Facts" refers to the stipulated facts contained in the JPTO. "JX-#_###" refers to the parties' joint exhibits and the corresponding exhibit number and page number. "PX-#_###" refers to Petitioner's exhibits and the corresponding exhibit number and page number. "DX-#_###" refers to Respondent's exhibits and the corresponding exhibit number and page number.

Disorder. Stip. Facts ¶ 8; DX-12_004 (Green Chimneys Intake); *see* also DX-14_001 (Green Chimneys Letter) (listing other diagnoses); Stip. Facts ¶ 31 (same).

5. Following her marriage to Roberto Torres, a U.S. citizen, on November 22, 1994, Ms. de la Rosa applied to adjust her immigration status to that of a lawful permanent resident of the United States ("LPR") based on an approved immediate relative petition. Stip. Facts ¶ 9; DX-8 (Ms. De la Rosa's Adjustment Application).

6. On July 5, 1995, Ms. de la Rosa's adjustment of status application was approved and she became an LPR. Stip. Facts ¶ 11; *see* JX-5_016 (Ms. de la Rosa's Naturalization Application) (showing LPR card); DX-9_001 (Ms. de la Rosa's LPR Record).

7. In July 1995, Santana was again admitted to Elmhurst Hospital Center and transferred to Queens Children's Psychiatric Center, where he received treatment for severe emotional and behavioral problems. Stip. Facts ¶ 12; DX-12_004–05 (Green Chimneys Intake).

8. In August 1995, Santana was again admitted to Queens Children's Psychiatric Center. Stip. Facts ¶ 13; DX-12_004 (Green Chimneys Intake).

9. On December 14, 1995, Santana became an LPR. Stip. Facts ¶ 14; JX-3_001 (Petitioner's LPR Record).

## II. The Voluntary Placement Agreement and Santana's Initial Placement

10. On October 16, 1996, Ms. de la Rosa signed a Voluntary Placement Agreement ("VPA") to "voluntarily transfer the care and custody of [Santana] to the [New York City] Commissioner of Social Services," requesting that Petitioner be placed in foster care. Stip. Facts ¶ 15; JX-9_001 (VPA).

11. Ms. de la Rosa entered into the VPA for the purpose of getting Santana access to the psychological care and educational support that he needed. *See* Deposition of Ms. de la Rosa at 43:25–44:21.[3]

12. Under the VPA, Ms. de la Rosa elected for an indefinite placement, under which she had the right to have Santana "discharged from foster care" at any time by filing a "Request for Discharge of Child from Foster Care." JX-9_002 (VPA). Upon filing such a request, the foster care agency was required to "return [Santana] to [her] within twenty (20) days after receiving [the] request **unless** a court order exists that would not allow the return or a court order is obtained to prevent the return." *Id.* (emphasis in original).

13. The VPA allocated decision-making authority in various respects between Ms. de la Rosa and the Commissioner of Social Services of the City of New York ("Commissioner" or "the State"), and provided for court review with respect to disagreements, as follows:

a. **Visitation.** The VPA provided that Ms. de la Rosa had the "right to determine, jointly with the agency, the terms and frequency of visitation" with Santana. JX-9_004 (VPA). It further specified that "[n]o one from [the] [C]hild Welfare Administration or the foster care agency [could] stop or limit [her] visits without approval from a court proceeding." *Id.*

b. **Health and Medical Care.**

i. *Ordinary Treatment.* The VPA provided that Ms. de la Rosa "agree[d] to the administration of any medical immunizations, tests and treatments, including dental and surgical treatment, that [was] considered necessary for the well-being of [Santana]." *Id.* at 005. She was to "be consulted" and have her "consent sought, if possible, whenever surgery [was] necessary." *Id.*

---

[3] There are no objections to this portion of Ms. de la Rosa's deposition. *See* JPTO at 9. To the extent Petitioner objects to any other portions of any other deposition transcripts offered by Respondent, *see id.* at 10-11, such objections are **OVERRULED AS MOOT**, as the Court does not rely on those particular excerpts in reaching its decision in this case (and, for what it is worth, nor do the parties in their respective proposed findings of fact or conclusions of law in any material way).

ii. *Emergency surgery.* With respect to emergencies, the Commissioner was authorized "to consent to . . . emergency surgery if [Ms. de la Rosa was] unavailable or [could not] be reached for consultation." *Id.*

*iii.* *Disagreements about health and medical care.* If the Commissioner "believe[d] that [Ms. de la Rosa's] failure to give such consent would endanger the life, health or safety of [Santana], a child protective proceeding [could] be initiated in order to obtain court authorization for the medical procedure." *Id.*

c. **Hearings.** The VPA provided for periodic court review of Santana's foster care status and further provided for "review [of] the case at the request of any of the parties involved, including the parent(s)/legal guardian." *Id.*

d. **Disagreements generally.** The VPA provided that Ms. de la Rosa had "the right to request a State Fair Hearing if [she] disagree[d] with any decision involving [her] child's placement," and could seek "court review" of "the decision made by the hearing officer." *Id.* at 006.

e. **Amendments.** The VPA provided that "none of [its] provisions may be changed without [Ms. de la Rosa's] consent . . . **and** the consent of the Commissioner," or their respective representatives. *Id.* (emphasis in original).

14. When Ms. de la Rosa entered into the VPA, she also signed a form designating her religious preference for Santana as Catholic. Stip. Facts ¶ 16.

15. On February 5, 1997, following entry of the VPA, Santana was admitted into foster care at the Green Chimneys Residential Treatment Center ("Green Chimneys") in Brewster, New York. Stip. Facts ¶ 17; *see* DX-12_001 (Green Chimneys Intake) (showing date of admission (DOA) as "2/5/97"); *see also* JX-8_001 (Green Chimneys Website) (explaining that Green Chimneys is a residential treatment center ("RTC") for children with various types of disorders).

16. On March 20, 1997, the Commissioner submitted a Petition for Approval of an Instrument, requesting that the Family Court of the State of New York ("Family Court") approve the VPA. Stip. Facts ¶ 18; JX-10 (Petition, Mar. 20, 1997).

17. On June 25, 1997, the Family Court held a hearing on the petition and found "[t]hat the best interest and welfare of the child would [ ] be promoted by removal of the child from the

home, and it would [ ] be contrary to the welfare of the child to continue to live in the home." JX-11_006 (Order, June 25, 1997). Accordingly, the Family Court granted the petition and ordered the "transfer of care and custody" of Santana to the Commissioner pursuant to the VPA's terms. *Id.*; *see also* Stip. Facts ¶ 20 ("[T]he Family Court issued a Final Order approving a petition by the Commissioner . . . to place Mr. Santana in the care of [the New York City Administration for Children's Services ("ACS")] for an indefinite period after a hearing attended by Ms. de la Rosa.").

**III. 1998 Family Court Order of Disposition and Return to Green Chimneys**

18. On June 10, 1998, the Commissioner petitioned the Family Court to continue Santana's foster care placement. JX-12 (Petition, June 10, 1998).

19. In August 1998, after Santana returned to Ms. de la Rosa's home for a recess week, she informed Green Chimneys that he would not be returning there. DX-13_001 (1998 UCR Risk Reassessment).

20. At a Family Court hearing on September 8, 1998, Ms. de la Rosa moved for Santana to be discharged from foster care. *Id.* Green Chimneys responded that Santana was not ready to be discharged. *Id.*

21. At the conclusion of the hearing, after considering factors including "the services which have been offered to strengthen and reunite the family" and "efforts which have been or will be made to promote the best interests of the child," the Family Court ordered "that foster care" and "the care and custody of [Santana] be and the same hereby is continued . . . ." JX-13_003 (Order, Sept. 8, 1998). The Family Court ruled that Petitioner "would be granted a one year extension of [foster care] placement with plans to prepare [Santana] for pre-trial discharge to [his] mother." DX-13_001 (1998 UCR Risk Reassessment). Santana then returned to Green Chimneys. *Id.*

22. In November 1998, Green Chimneys requested permission from Ms. de la Rosa to take Santana outside of New York State for a school trip, which Ms. de la Rosa granted on December 13, 1998. *See* PX-2 (Green Chimneys School Trip Authorization); JX-6 (ACS UCR Face Sheet).

**IV. 1999 Family Court Order of Disposition and First Trial Discharge**

23. On July 12, 1999, the Commissioner again petitioned the Family Court to continue Santana's foster care placement. JX-14 (Petition, July 12, 1999). The petition noted that Santana's "MOTHER IS INVOLVED IN PLANNING AND VISITING . . . . GOAL IS DISCHARGE TO MOTHER." *Id.* at 003.

24. On August 27, 1999, Santana was placed on a monitored trial discharge, which allowed him to reside with Ms. de la Rosa to determine if his foster care placement could be discontinued. Stip. Facts ¶ 21; DX-14_001–02 (Green Chimneys Letter).

25. On September 1, 1999, the Family Court held a hearing and, after considering factors including "the services which have been offered to strengthen and reunite the family" and "efforts which have been or will be made to promote the best interests of the child," ordered "that foster care" and "the care and custody of [Santana] be and the same hereby is continued . . . ." JX-15_003 (Order, Sept. 1, 1999). The Family Court's order also provided for a "trial discharge to [Santana's] mother." *Id.*

26. Santana's trial discharge lasted about six months until March 6, 2000, when it was "disrupted . . . due to [his] truancy and [his] mother's inability to manage his oppositional/defiant behavior." JX-16_003 (Petition, Sept. 12, 2000) (capitalization omitted). Santana then returned to Green Chimneys. Stip. Facts ¶ 22.

27. On April 27, 2000, Santana was transferred from Green Chimneys to another RTC called Graham Windham. Stip. Facts ¶ 23; JX-16_003 (Petition, Sept. 12, 2000) (showing transfer date); JX-23_014 (ACS Permanency Review).

28. On the same day, Graham Windham requested and received Ms. de la Rosa's permission to provide emergency medical care to Santana as needed during his time enrolled at the Graham Windham residential campus. *See* PX-5 (Graham Windham Consent for Medical Care).

29. On the same day, Graham Windham requested and received Ms. de la Rosa's permission to administer antipsychotic and antidepressant medication to Santana during his time enrolled at the Graham Windham residential campus. *See* PX-4 (Graham Windham Consent for Psychotropic Medication).

30. In July 2000, Ms. de la Rosa took Santana on a family trip to the Dominican Republic for more than five weeks. *See* JX-5_004 (Ms. De la Rosa's N-400) (listing trips outside of the United States); *see also* DX-3_003 (Petitioner's N-600) (same).

**V. 2000 Family Court Order of Disposition and Second Trial Discharge**

31. On September 12, 2000, the Commissioner again petitioned the Family Court for a review of Santana's foster care placement. JX-16_001–05 (Petition, Sept. 12, 2000). The petition stated the "GOAL IS DISCHARGE TO MOTHER." *Id.* at 003.

32. On October 31, 2000**,** the Family Court held a hearing on the petition and, after considering factors including "the services that have been offered to strengthen and reunite the family" and "whether it would be contrary to the best interests of the child to continue in the home," found that "[a] permanency plan of return to mother is in the child's best interest" and continuing foster care was in "the child's best interest" because it would help "effectuate [the] goal

of return to mother." JX-17_002 (Order, Oct. 31, 2000). The Order further noted that a second "[t]rial discharge is anticipated by end of school year." *Id.* at 003.

33. On December 31, 2000, caseworkers approved a second trial discharge of Santana to his mother's home. Stip. Facts ¶ 24; JX-18_002 (Petition, Jan. 8, 2002) ("CHILD WAS TRIAL DISCHARGE[D] TO MOTHER ON 12/31/00.").

34. The second trial discharge began in January 2001. Stip. Facts ¶ 24; *see* JX-24_004 (2003 UCR Risk Assessment) ("[Santana's] behavior stabilized during his stay at Graham Windham and [he] was trial discharge[d] to his biological mother on January of 2001.").[4]

35. In August 2001, Ms. de la Rosa took Santana on a family trip to the Dominican Republic for twenty-five days. *See* JX-5_004 (Ms. De la Rosa's N-400) (listing trips outside of the United States); DX-3_003 (Petitioner's N-600) (same).

## VI. 2002 Family Court Order of Disposition

36. On January 8, 2002, the Commissioner again petitioned the Family Court for a review of Santana's foster care placement and permanency plan. JX-18_001–05 (Petition, Jan. 8, 2002). The petition noted that Santana's trial discharge was continuing and that "HE IS DOING WELL AT HOME AND ALSO IN SCHOOL. . . . IF EVERYTHING GOES WELL FINAL DISCHARGE WILL PROCEED." *Id.* at 002. The State's permanency plan continued to state that the goal was "to return the child to the parent." *Id.* at 005.

37. On February 12, 2002, while the second trial discharge was ongoing, an ACS caseworker "made an attempt to bring [Santana] back to Graham Windham" after it was reported

---

[4] The Family Court's April 22, 2002, order incorrectly states in the handwritten notes that this trial discharge was ordered on December 31, 2001. JX-19_002 (Order, Apr. 22, 2002). Other documents correctly state that the trial discharge was ordered on December 31, *2000*, and began in January *2001*. *See* JX-18_002 (Petition, Jan. 8, 2002); JX-24_004 (2003 UCR Risk Assessment).

that his behavior at Ms. de la Rosa's home was "deteriorat[ing]." JX-23_014 (ACS Permanency Review). Santana "went rushing out the door, refusing to return back to care." *Id.* On February 15, 2002, a caseworker reported that Santana was "AWOL," "filed a missing person's report," and obtained a "warrant . . . from the Manhattan Family Court." *Id.* On March 12, 2002, Santana was apprehended, brought to Family Court, and then taken back to Graham Windham. *Id.* On March 18, 2002, Santana disappeared from Graham Windham. *Id.*

38. On April 4, 2002, Ms. de la Rosa informed ACS that Santana had returned to her home. *Id.* Santana refused further efforts to return him to Graham Windham and remained living at his mother's home throughout the remainder of his foster care placement, *i.e.*, until his eighteenth birthday on June 4, 2003. *See* JX-24_004 (2003 UCR Risk Assessment).

39. On April 22, 2002, the Family Court held a hearing on the State's January 8, 2002, petition and, after considering factors including "the services that have been offered to strengthen and reunite the family" and "whether it would be contrary to the best interests of the child to continue in the home," found that "the permanency plan of return to mother is in [the] best interest of [the] child" and continuing foster care was in "the child's best interest" because it would help "effectuate the goal of return to mother." JX-19_002 (Order, Apr. 22, 2002). The Family Court noted that Santana remained trial discharged to his mother's home. *See id.*

## VII. Ms. de la Rosa's Naturalization and 2003 Family Court Order of Disposition

40. On March 12, 2003, Ms. de la Rosa became a naturalized U.S. citizen. Stip. Facts ¶ 25; JX-4_001 (Naturalization Certificate).

41. On March 28, 2003, the Commissioner submitted a final petition for review of Santana's foster care placement and permanency plan. JX-20 (Petition, Mar. 28, 2003). The petition noted that Santana was "AWOL AFTER A FAILED TRIAL DISCHARGE TO

MOTHER. WARRANT HAS BEEN ISSUED. AGENCY EFFORTS TO RETURN CHILD TO PLACEMENT UNSUCCESSFUL AS YET." *Id.* at 003.

42. On May 6, 2023, the Family Court held a hearing on the petition, and, after considering factors including "the services which have been offered to strengthen and reunite the family" and "whether it would be contrary to the best interests of the child to continue in the home," found that "the permanency plan of return to mother is in the child's best interest" and continuing foster care was in "the child's best interest" because it would help "effectuate [the] goal of return to mother." JX-21_002 (Order, May 6, 2003). The Family Court then ordered that Santana's foster care placement would continue until his eighteenth birthday, June 4, 2003. *Id.* ("Care continued until 6/4/03, the child's 18th birthday.").

43. Santana resided at Ms. De la Rosa's home during at least 81 days between her naturalization on March 12, 2003, and his eighteenth birthday on June 4, 2003. Stip. Facts ¶ 26. When Santana turned eighteen, he aged out of foster care. Stip. Facts ¶¶ 27, 29; *see* JX-21_003 (Order, May 6, 2003).

## VIII. Santana's Immigration Proceedings

44. In June 2020, following Santana's two New York criminal convictions, the U.S. Department of Homeland Security commenced removal proceedings against him by filing a Notice to Appear charging him with removability pursuant to 8 U.S.C. §§ 1227(a)(2)(A)(ii), (iii). DX-1_001 (IJ Decision).

45. An immigration judge ("IJ") sustained the charges of removability and ordered Santana removed to the Dominican Republic. *Id.* at 017. Among other defenses, Santana contended that he could not be removed because he had derived U.S. citizenship through Ms. de la Rosa. *Id.* at 004–07. The IJ disagreed and found that Santana had not derived U.S. citizenship because, according to the IJ, he was not in Ms. de la Rosa's legal custody between the time she

naturalized and his eighteenth birthday, but was instead in the legal custody of the State due to his foster care placement. *Id.* at 005–007.

46. Santana filed an administrative appeal with the BIA, contending that the IJ erred in finding that he had not derived U.S. citizenship through Ms. de la Rosa. DX-2_002 (BIA Decision); *see* ECF No. 2-22 at 5. The BIA affirmed the IJ's decision and dismissed Santana's administrative appeal. DX-2_004 (BIA Decision); *see* ECF No. 2-22 at 7.

47. Santana then filed a petition for review of the BIA's decision with the U.S. Court of Appeals for the Second Circuit. *See Santana De La Rosa v. Garland*, No. 22-6020 (2d Cir.). He again contended that he could not be removed because he had derived U.S. citizenship through Ms. de la Rosa. ECF No. 1. Upon the parties' joint motion, the Second Circuit concluded that there was "a genuine issue of material fact about [Santana's] nationality" and transferred the proceedings to this Court for a *de novo* hearing on the issue of Petitioner's citizenship status. ECF No. 1 at 1 (quoting 8 U.S.C. § 1252(b)(5)(B)).

## CONCLUSIONS OF LAW

### I. Statutory Overview

"Persons not born in the United States acquire citizenship by birth only as provided by an Act of Congress." *Miller v. Albright*, 523 U.S. 420, 424 (1998).[5] In derivative citizenship cases, the petitioner bears the burden of proving that the factual basis for citizenship exists. *Khalid v. Sessions*, 904 F.3d 129, 138-39 (2d Cir. 2018) (citing *Gil v. Sessions*, 851 F.3d 184, 188 (2d Cir. 2017)). In determining whether a child born outside the United States acquires citizenship through a parent, courts must look to "the law in effect when [petitioner] fulfilled the last requirement"

[5] In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

needed to qualify. *Duarte-Ceri v. Holder*, 630 F.3d 83, 87 (2d Cir. 2010) (quoting *Ashton v. Gonzales*, 431 F.3d 95, 97 (2d Cir. 2005)).

Under the Child Citizenship Act of 2000 ("CCA" or "Act"), a child born outside the United States automatically derives citizenship if he fulfills three requirements:

> (1) At least one parent of the child is a citizen of the United States, whether by birth or naturalization.
>
> (2) The child is under the age of eighteen years.
>
> (3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.

8 U.S.C. § 1431(a).

Here, the parties stipulate that Petitioner satisfied the first two prongs of the CCA: (1) Ms. de la Rosa became a naturalized U.S. citizen on March 12, 2003, which (2) was before Santana's eighteenth birthday on June 4, 2003. *See* Stip. Facts ¶¶ 25-26. With respect to the third prong, the parties further stipulate that Santana was residing in the United States in Ms. de la Rosa's physical custody between March 12, 2003, and June 4, 2003, and that he was lawfully admitted for

permanent residence at the time.[6] *See* Stip. Law ¶ 1[7]; Stip. Facts ¶¶ 26, 28. Thus, the parties stipulate that "[t]he sole issue before this court is whether Mr. Santana"—who, although residing

[6] On June 6, 2026, the Government sought to withdraw its stipulation that Santana was lawfully admitted for permanent residence. *See* ECF No. 70. The Court heard argument on this request along with the parties' motions in limine on June 16, 2026, and issued an oral ruling denying the request during a conference on June 18, 2026. The Court's reasoning was stated fully on the record at the June 18, 2026, conference, but it briefly recounts the highlights here. The Government's request was premised on the late disclosure by Petitioner of what the Government described as qualitatively new evidence, in the form of a document signed by a "reviewing physician" who contemporaneously diagnosed Petitioner with a mental disorder after review of his medical history. *See* DX-19. The Government argued this was new "medical evidence from an authoritative source that demonstrates Petitioner did not meet the health-related admissibility standards for adjustment of status to Lawful Permanent Resident status." ECF No. 77 at 1-2. The Government sought not only to rely on this evidence, but also to adduce testimony from a new witness, purportedly to show that this medical evidence rendered invalid Santana's adjustment to LPR status. The Government further proposed "delaying the trial to permit Petitioner to similarly propose introduction of additional evidence and/or witness testimony," *id.* at 2—in other words, postponing trial, re-opening discovery, and adding an entirely new dimension to the case.

The Court denied that request. "Under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court." *Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 14 (S.D.N.Y. 2019). A court "should not disturb a stipulation absent a showing of good cause such as fraud, collusion, mistake or duress, or unless the agreement is unconscionable or contrary to public policy, or unless it suggests an ambiguity indicating that the words did not fully and accurately represent the parties' agreement." *Katel Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 66 (2d Cir. 2010); *see also Mason Tenders*, 400 F. Supp. 3d at 14 (same). That standard was not met here: there is no suggestion of ambiguity in the stipulation, no argument that the stipulation is unconscionable or contrary to public policy, and the Government acknowledges there is no indication of intentional concealment of the document in question. *See* ECF No. 77 at 2 n.3. So, there is no suggestion of fraud, collusion, mistake, or duress, as those terms have been used in this context.

In any event, the new document did not contain categorically new information justifying the Government's requested relief. Rather, the parties were long aware and had stipulated to evidence of Santana's mental illness and treatments around the time of his adjustment to LPR status, including three separate hospitalizations from August 1994 to August 1995. *See supra*, Findings of Fact ¶¶ 5, 7, 8 (citing stipulations and exhibits). To the extent the validity of Santana's adjustment to LPR status might have been called into question by his mental health, the Government had long been on notice of Santana's history in that regard, and the newly disclosed document did not constitute categorically new evidence that could establish good cause to withdraw the Government's stipulation that Petitioner's adjustment to LPR status was valid.

with his mother, was subject to a court-approved voluntary foster care placement agreement—"was residing in [her] *legal* custody" when she became a naturalized citizen. JPTO at 7 (emphasis added); *see also id.* at 3 ("The only issue for trial is whether Mr. Santana met his burden, by a preponderance of the evidence, to demonstrate that he was in the legal custody of his U.S. Citizen mother at some time between March 12, 2003, and June 4, 2003."). The Court therefore turns to a discussion of the meaning of the term "legal custody" as used in the CCA.

This inquiry turns out to be less simple than it initially appears. The CCA itself does not define the term "legal custody" and there is no authoritative caselaw concerning the term's meaning under the CCA. The most instructive case—as to both the meaning of the term itself and the method that a court should employ in construing the Act—is the Second Circuit's decision in *Khalid v. Sessions*, 904 F.3d 129 (2d Cir. 2018), which considered the meaning of the CCA's counterpart term, "physical custody." The Court now turns to a summary of that case.

## II. *Khalid v. Sessions*

In *Khalid*, the petitioner was arrested and subject to pretrial detention at a youth correctional center when his father naturalized. *See id.* at 132. The case "present[ed] one question for review: whether," despite the petitioner's pretrial detention, "he was in the 'physical custody'

---

Finally, the procedural posture of the case also counseled against allowing withdrawal of the stipulation. The JPTO containing the parties' stipulations was first submitted on May 18, 2026. ECF No. 51 (stricken). On May 22, 2026, the parties requested to submit a revised JPTO, ECF No. 55, which the Court granted on May 27, 2026, ECF No. 58. Then, on June 10, 2026, the Government sought to withdraw its stipulation as to Petitioner's adjustment of status (which would require revising the JPTO again), ECF No. 70, and on June 16, 2026—six days before the trial was scheduled to begin on June 22, 2026—also sought to re-open discovery and to postpone trial, ECF No. 77. In light of that procedural posture, the relief sought by the Government was inappropriate.

[7] "Stip. Law" refers to the stipulated issues of law contained in the parties' JPTO. ECF No. 55.

of his father under 8 U.S.C. § 1431(a) at the time his father naturalized." *Id.* The Circuit held that he was, and therefore obtained derivative citizenship.

The Circuit began its analysis "by first examining the text of the statute itself, and, concluding that the term 'physical custody' is not entirely clear, . . . then turn[ed] to the broader statutory context and its history." *Id.* at 132. Considering the text, the Circuit reasoned that because the term "physical custody" in the CCA references family law principles grounded in state law, it would first review state law definitions of the term. *See id.* at 133-35. The Circuit distilled several principles from state law, namely, that "physical custody" is "often used to define a legal relationship between the child and parent" encompassing "the right and obligation to provide a home for the child and to make the day-to-day decisions," and that it does not necessarily require that a child "actually reside[]" with the parent holding physical custody. *Id.* at 134.

But the Circuit ultimately determined that "state law uses of the term 'physical custody' are inconclusive in defining that term [under the CCA]," so turned to the CCA's statutory context and history for further guidance. *Id.* at 135. The Circuit observed that the Act's requirements "help[] ensure that a child's 'real interests' are in the United States because of the connection to the U.S. citizen parent." *Id.* at 137. There could be "no dispute that Khalid had such a connection to his United States citizen father at the time Khalid's father naturalized," despite the fact that he was in pretrial detention at the time. *Id.* at 138. Therefore, the petitioner's "acquisition of derivative citizenship [did] not violate Congress's demand that the child ha[ve] a strong connection to the United States to acquire derivative citizenship." *Id.* Finally, the Circuit looked to relevant canons of statutory construction and concluded that they "support our conclusion that physical custody under 8 U.S.C. § 1431 does not simply end on a brief, temporary separation from the naturalizing parent." *Id.*

## III. "Legal Custody" under the CCA

Following the Circuit's guidance in *Khalid*, the Court starts with the statutory text. Although "naturalization laws must 'be construed according to a federal, rather than state, standard . . . [i]t is [also] a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken." *Khalid*, 904 F.3d at 133. As used in the CCA, "custody" is a term of art from family law, which "is an area of law that federal courts and Congress leave almost exclusively to state law and state courts." *Id.* Where, as here, "there is no extant body of federal common law in the area of law implicated by the statute," courts must "look to state law for a rule of decision." *Garcia v. U.S. Immigr. & Customs Enf't*, 669 F.3d 91, 95 (2d Cir. 2011). Therefore, a "reference to state law is appropriate . . . for determining 'legal custody,' as '[l]egal relationships between parents and children are typically governed by state law, there being no federal law of domestic relations.'" *Id.* (quoting *Fierro v. Reno*, 217 F.3d 1, 4 (1st Cir. 2000)).

### A. The Definition of "Legal Custody" under State Law

In *Khalid*, the Second Circuit surveyed state law and described "legal custody" as broad "decision-making authority" over a child's life. 904 F.3d at 134. This was in contrast to "physical custody," which refers to "caregiving authority," or "the right and obligation to provide a home for the child and to make the day-to-day decisions required during the time the child is actually with the parent having such custody." *Id.* New York courts have similarly explained that "legal custody . . . is to be distinguished from . . . physical custody," with the latter referring to "the day-to-day child rearing decisions," while the former refers to authority over "the important issues, such as religious training, education and medical care . . . ." *Trapp v. Trapp*, 526 N.Y.S.2d 95, 97 (N.Y. App. Div. 1st Dep't 1988); *see also Custody*, Black's Law Dictionary (12th ed. 2024)

(defining "legal custody" as "[t]he authority to make significant decisions on a child's behalf, including decisions about education, religious training, and healthcare").

While a single, comprehensive definition of "legal custody" under state law, and in turn under the CCA, is somewhat elusive,[8] the parties agree that it boils down to broad decision-making authority. In the parties' respective proposed findings of fact and conclusions of law, they both propose defining legal custody, at least in part, as broadly relating to "decision-making authority" over Santana. *See* Pet'r's Proposed Findings of Fact and Conclusions of Law ("Pet'r's FOFCOL"), Conclusions of Law ¶ 11, ECF No. 60 (stating that "[t]he term 'legal custody' under 8 U.S.C. § 1431(a) refers broadly to decision-making authority"); Resp't's Proposed Findings of Fact and Conclusions of Law ("Resp't's FOFCOL"), Conclusions of Law ¶ 19, ECF No. 61 (arguing that Ms. de la Rosa did not "maintain ultimate decision-making authority over [Santana] during the foster care placement").[9] To resolve the question presented in this case, the Court therefore looks to whether Santana's mother lacked the kind of decision-making authority that the parties agree forms the essence of "legal custody" for purposes of the CCA.

[8] *See J.R. v. M.S.*, 55 N.Y.S.3d 873, 875 (N.Y. Sup. Ct. 2017) ("The terms 'legal custody,' 'physical custody,' and 'visitation'—all deeply ingrained components of the process by which we determine what role each parent will play in the child's life—are gradually giving way to new terms," in part because "[t]he word 'custody' itself—whether in the context of legal custody or physical custody—is fraught with implications.").

[9] In *Khalid*, "[t]he parties disagree[d] about the guidance that state law offer[ed]" as to the meaning of "physical custody" and whether it required that a child actually reside with the parent in question. 904 F.3d at 133. The Circuit then undertook an exhaustive examination of various state law definitions of that term. But there is not the same sort of disagreement about the nature of the term "legal custody" here. Rather, the parties agree that the essence of "legal custody" is "decision-making authority."

### B. The Legal Effect of Voluntary Foster Care Placement in New York State

In *Khalid*, the Second Circuit "conduct[ed] an inquiry into the particular custody arrangement at the time the parent naturalize[d] and the child [became] eligible for citizenship" to determine if the petitioner's pretrial detention status had removed him from his father's "physical custody." 904 F.3d at 139. And so, here, the Court considers whether Santana's voluntary foster care arrangement removed decision-making authority from his mother (who indisputably had legal custody of Santana prior to the foster care placement), both generally and with respect to particular issues such as religion, education, and medical care, which New York courts have described as the markers of "legal custody." *See Trapp*, 526 N.Y.S.2d at 97. As explained below, despite the foster care placement, Ms. de la Rosa retained substantial decision-making authority in areas considered to be at the core of "legal custody."

#### 1. Decision-Making Authority under the VPA

##### a. Discharge from Foster Care

Under the VPA, both Ms. de la Rosa and the State had a say in whether Santana remained in foster care. The Government argues that, while Santana was in foster care, "the State was the ultimate decision-maker . . . ." Resp't's FOFCOL, Conclusions of Law ¶ 19 (citing JX-9_003 (VPA)). The Government points to the fact that in 1998, when Ms. de la Rosa sought to keep Santana from returning to Green Chimneys and instead have him discharged from foster care, the Family Court denied her request and granted the State's petition to continue Santana's foster care placement. *See id.* (citing DX-13_001 (1998 UCR Risk Assessment)). But the Family Court is not "the State"; it is a part of New York's judicial branch. *See* N.Y. Const. art. VI, § 13; N.Y. Fam. Ct. Act §§ 111 (McKinney 1962), *et seq.* The Family Court serves to *adjudicate* disputes among individuals or between individuals and the State. The Family Court does not itself hold physical or legal custody—rather, it issues decisions assigning custody among various parties.

*See, e.g.*, N.Y. Const. art. VI, § 13 (providing that the Family Court shall have jurisdiction over cases involving "the custody of minors"); N.Y. Fam. Ct. Act § 651 (McKinney 1996) (citing N.Y. Dom. Rel. Law § 240(1)) (authorizing the Family Court to determine "custody or visitation of minors" in separation and divorce cases); N.Y. Soc. Serv. Law § 384-b(3)(a) (McKinney 2003) (authorizing the Family Court to order that "guardianship and custody" of a "destitute or dependent child" be committed to a relative or foster parent).

So, while Ms. de la Rosa failed in her efforts to discharge Santana from foster care and remove him from Green Chimneys in 1998, the State was also unable to unilaterally continue foster care or require Santana to return to Green Chimneys. Instead, the State had to seek a judicial order from the Family Court. If anything, the VPA seems to have given Santana's mother primacy on the issue of discharge by enabling her to withdraw him from foster care at any time and requiring the State to honor such a request within twenty days *unless* it obtained a court order. *See* JX-9_002 (VPA). Thus, the VPA gave both Ms. de la Rosa and the State a say in whether foster care would be ended or continued, and the Family Court—a neutral adjudicator—was the ultimate arbiter. *See id.* That the State prevailed over the question of discharge when put before the Family Court in 1998 does not mean Ms. de la Rosa retained no decision-making authority over the matter.

**b. Religious Affiliation**

Santana's mother retained decision-making authority over Santana's religious affiliation. New York Family Court Act Section 116 states that, "[w]henever a child is remanded or committed by the court to any duly authorized association, agency, society or institution . . . such commitment must be made, when practicable, to a duly authorized association, agency, society or institution under the control of persons of the same religious faith or persuasion as that of the child," and that this provision shall "be applied so as to give effect to the religious wishes of . . . the parents of the

child." N.Y. Fam. Ct. Act §§ 116(a), (g) (McKinney 1970).[10] Here, there is no dispute that Santana's mother designated his faith as Catholic shortly after signing the VPA. Stip. Facts ¶ 16.

**c. Education**

The Court has been unable to identify New York law, statutory or otherwise, indicating whether a parent loses decision-making authority over a child's education after the child is voluntarily placed in foster care.[11] And the VPA does not say anything directly about whether either party had ultimate decision-making authority over Santana's education. But as noted above, under the VPA, Ms. de la Rosa had the ability to end Santana's foster care placement altogether, including his educational placement. *See* JX-9_002 (VPA). The State could forestall such an action only by obtaining a court order to continue foster care. *See id.*

In practice, Santana's mother continued to exercise some degree of decision-making authority over his education while he was subject to foster care placement. In 1998, while Santana was at Green Chimneys, his mother provided consent for an out-of-state school trip. *See* PX-2 (Green Chimneys School Trip Auth.). In 1999, during Santana's first trial discharge to his mother, she was involved in his education as indicated on his Individualized Education Program ("IEP") for the year. *See* PX-3 (N.Y. Bd. of Educ. IEP). And in December 2000, shortly before Santana's second trial discharge while he was still at Graham Windham, Ms. de la Rosa signed a form

---

[10] This version of the statute was in effect when Santana's mother naturalized (it remained in effect from 1970 until 2008). *See Duarte-Ceri*, 630 F.3d at 87 (holding that compliance with naturalization law is determined by reference to the law in effect at the relevant time). In any event, the quoted language remained unchanged when the statute was amended in 2008 and remains current today. *See* N.Y. Fam. Ct. Act § 116(a), (g) (McKinney 2026).

[11] While the Court cannot locate a legal source for this proposition and therefore does not rely on it, it notes that the New York City Department of Education website states that, "[u]nless a court order says otherwise, the birth/adoptive parent of a child in foster care keeps the right to make educational decisions for their child." *Students in Foster Care*, N.Y.C. Pub. Schs., https://www.schools.nyc.gov/school-life/special-situations/students-in-foster-care.

consenting to his placement in special educational classes. *See* PX-6 (Special Educ. Permission Form).

In sum, the VPA did not specify who had primary decision-making authority over educational matters. But Ms. de la Rosa did have the ability to withdraw Santana from foster care—and thus his educational institution—altogether, which the State could only block with a Family Court order. And throughout Santana's time in foster care, including while he was placed at residential treatment centers, Ms. de la Rosa continued to provide her consent for school activities and services.

**d. Medical Care**

"[P]arents retain the right to make certain medical decisions for their children in foster care, up until the moment that parental rights are terminated." *Matter of Athena Y.*, 161 N.Y.S.3d 335, 337 (N.Y. App. Div. 3d Dep't 2021). "While ACS typically takes over the right to make routine, prophylactic decisions as well as emergency ones, any important decision for which there is time to consider the options are reserved for parents, in the first instance." *Matter of Matthew V.*, 68 N.Y.S.3d 796, 802 (N.Y. Fam. Ct. 2017).

Here, while the VPA delegated day-to-day decision-making over Santana's medical care to the Commissioner, it reserved authority over particularly important medical decisions to Santana's mother. *See* JX-9_005 (VPA). For example, the VPA provided for Ms. de la Rosa's consent to surgery, indicating that she held ultimate decision-making authority in this regard. *See id.* Even with respect to emergency surgery, the Commissioner could act unilaterally only if Ms. de la Rosa was "unavailable or [could not] be reached for consultation." *Id.* Finally, the Commissioner could not unilaterally override Ms. de la Rosa if she withheld consent to any medical procedure, but rather could seek court authorization for the procedure if her "failure to

give such consent would endanger the life, health or safety of [Santana]." *Id.* In practice, Ms. de la Rosa's consent was sought and obtained for various medical treatments, at least while Santana was placed at Graham Windham in 2000. *See* PX-4 (Graham Windham Consent for Psychotropic Medication signed by Ms. de la Rosa); PX-5 (Graham Windham Consent for Medical Care signed by Ms. de la Rosa).

It seems clear, then, that both Santana's mother and the State had some decision-making authority over medical care, both as a matter of New York law generally and under the terms of the VPA specifically. If anything, Santana's mother had more authority in this regard because (1) only she could consent to certain treatments (unless she were unavailable in an emergency), and (2) if she withheld consent, her decision could only be overruled in certain circumstances and with a court order. *See* JX-9_005 (VPA).

**e. Other Issues**

The VPA allocated authority with respect to other significant decisions as follows:

- **Visitation.** No single party controlled decisions as to visitation. The VPA provided for "joint[]" authority to make such decisions. JX-9_004 (VPA). The State could not unilaterally stop or limit Ms. de la Rosa's visits "without approval from a court proceeding." *Id.*

- **Disagreements generally.** Ms. de la Rosa lacked the authority to overrule the Commissioner's decisions, but she had the right to request an administrative hearing and, if unsuccessful, court review of "any decision" made by the hearing officer. *Id.* at 006.

- **Amendments to the Agreement.** Neither party had authority to unilaterally change the terms of the VPA; it could be amended only with the consent of *both* Ms. de la Rosa and the Commissioner, or their respective representatives. *Id.*

The Government notes that, in the event of a disagreement between Ms. de la Rosa and the State with respect to most questions concerning Santana's care, she "was permitted a fair hearing to voice disagreement with aspects of Petitioner's foster care placement," but "with no guarantee that her preferences would prevail." Resp't's FOFCOL, Conclusions of Law ¶ 19. But this was

also true of the State: under the VPA's terms, Ms. de la Rosa had the right to seek court review of the State's caregiving decisions and have them overruled. *See* JX-9_006 (VPA). In other words, even on issues for which the State had primary decision-making authority, its discretion was not unlimited and was always subject to judicial override. Thus, to the extent the Government contends that Ms. de la Rosa could not have had legal custody of Santana because her decision-making authority was subject to court review, the same was true of the State.

Put another way, if the Government were correct that the possibility of judicial override of a caregiving decision was enough to defeat a party's legal custody, then the State would lack legal custody of Santana, too—leaving no person or entity with legal custody of him. That would make little sense. Rather, it seems fair to say both Ms. de la Rosa and the State had some degree of decision-making authority over Santana, which in turn suggests that both had some degree of "legal custody" of him.

**2. Analogy to Joint Custody**

Santana urges this Court to analogize his foster care placement to a joint custody arrangement between separated parents. *See* Pet'r's FOFCOL, Conclusions of Law ¶ 6 (citing 8 C.F.R. § 320.1(2) (2026), which provides that the Government will "consider a U.S. citizen parent who has been awarded 'joint custody,' to have legal custody of a child"). The Court was initially skeptical of this analogy because it can find no references in New York state law to the idea that an individual and the State can have "joint" custody of a child. However, a review of joint custody arrangements between separated parents leads the Court to conclude that the division of decision-making authority for children in foster care is, in fact, analogous to how joint custody arrangements between separated individuals are often arranged.

New York courts have explained that

> [j]oint legal custody, or joint-decision making . . . is to be distinguished from joint physical custody, where the children live alternately with both parents. In joint legal custody . . . although the children actually live with only one parent, both parents continue to share the same rights and responsibilities as they did during the marriage to participate in the decisions affecting their children.

*Trapp*, 526 N.Y.S.2d at 97. "Sharing" rights and responsibilities does not mean that they are held equally. As a New York trial court explained in *J.R. v. M.S.*, a joint legal custody arrangement may establish "certain zones where each party, after full consultation with the other, will have final decision-making authority," and "other zones where a hybrid format will apply, meaning that certain decisions that come within the ambit of that zone will be subject to the tie-breaking vote of a parent coordinator or other designated professional." 55 N.Y.S.3d 873, 880-81 (N.Y. Sup. Ct. 2017); *see also id.* at 881 (describing the "zones" approach as having a "well-established foundation of case law approving of the process," then citing New York appellate court cases).

In *J.R.*, the court allocated decision-making between the parents as follows:

- **Religion.** "Because the evidence establishes that the parties intended to raise the child Jewish and sent him to a Jewish preschool, the father will have final decision-making with regard to the child's religious upbringing," but "[t]his authority . . . will not be unfettered." *Id.* at 883.

- **Education.** The father would be the "final decision-maker" on education issues, except for decisions with respect to changing schools. *Id.* at 882. Further, "[i]f consensus cannot be reached by the parents as to the new school that the child will attend, then a parent coordinator will cast the tie-breaking vote." *Id.*

- **Medical care.** The mother would be the "final decision-making authority as to medical issues" but with "one carve-out[:] . . . a provision requiring mutual agreement to change either the pediatrician or the therapist. Absent such an agreement, a parent coordinator will be empowered to break the deadlock." *Id.*

- **Other issues.** The mother had "final decision-making as to both what camp the child attends and how long he attends," and as "to weekly organized sports activities," but with the caveat "each parent will be free to select extracurricular activities, athletic or otherwise, that take place during his or her individual parenting time." *Id.* at 882-83.

As to "physical custody," the court made no definitive determination, but "provide[d] that the child shall reside primarily with the mother." *Id.* at 883.

Such a joint custody arrangement, in which both parents are properly described as having "legal custody" of the child under New York law, is not wholly unlike Santana's foster care arrangement. In *J.R.*, one parent, the father, had primary (but not unfettered) decision-making authority over religious matters. In Santana's case, his mother similarly had primary decision-making authority in this zone. In *J.R.*, the father also had primary decision-making authority over educational matters, but with an exception: a decision to change schools had to be made jointly, with a third party holding a tie-breaking vote. Similarly, here, Santana's mother had the right to withdraw Santana from foster care altogether, including the school in which he was placed. While the State could oppose that decision, it could not block it unilaterally. In such cases, a court would ultimately decide the dispute—as in fact occurred when Santana's mother attempted to pull him from Green Chimneys. *See* DX-13_001 (1998 UCR Risk Assessment); JX-13_003 (Order, Sept. 8, 1998). With respect to medical matters, in *J.R.*, the mother had primary decision-making authority, but with one exception: a decision to change providers would have to be made jointly, with a third party holding a tie-breaking vote. Similarly, for Santana, the VPA committed everyday decision-making to the Commissioner, but major decisions such as surgery required his mother's consent, which could only be bypassed if she was unavailable in an emergency or, if consent was withheld, overridden with a court order.

The joint custody arrangement in *J.R.* is also instructive because it illustrates that the Government's characterization of "legal custody" as indivisible and mutually exclusive is not how the concept is always applied in state law. *See Fuentes v. Bd. of Educ. of N.Y.C.*, 12 N.Y.3d 309, 314 (N.Y. 2009) (holding that, in parental separation cases, "unless [a] custody order expressly permits joint decision-making authority or designates particular authority with respect to the child's education, a noncustodial parent has no right to 'control' such decisions," and thereby

affirming that New York courts may institute joint legal custody arrangements). According to the Government, the State had sole legal custody over Santana because the State was the ultimate decision-maker with respect to most major issues. *See* Resp't's FOFCOL, Conclusions of Law ¶ 19. In fact, as the preceding discussion reveals, this characterization is not entirely accurate: the State's decision-making authority was limited in important ways. More fundamentally, the facts that Santana's mother could not make certain decisions unilaterally and that any decisions she made were subject to judicial override may also be true of parents in a joint custody arrangement. *See J.R.*, 55 N.Y.S.3d 873. If, for these reasons, she lacked legal custody over Santana, then many parents in joint custody arrangements would similarly lack legal custody over their own children.

**3. Other New York Legal Authority Cited by the Government Concerning Foster Care and Custody**

Separately and apart from the above, some New York statutes and cases concerning foster care, while not addressing decision-making authority specifically, reference the concept of "custody" generally. The Government cites some of these authorities in its filings, contending that they support the notion that a child who is under a voluntary foster care placement is in legal custody of the State. While these authorities hold some surface appeal for the Government's position, upon closer inspection, they provide limited guidance because they: (1) post-date the relevant time period, which the Government acknowledges renders them inapt; (2) are ambiguous as to whether they refer to *legal* custody specifically; or (3) are inapposite for other reasons.

For example, in its Proposed Findings of Fact and Conclusions of Law, the Government initially cited two provisions of the New York Family Court Act: Section 657, which states that "persons possessing a lawful order of guardianship or custody of a child shall have the right and responsibility to make decisions, including issuing any necessary consents, regarding the child's protection, education, care and control, health and medical needs, and the physical custody of the

person of the child"; and Section 1089(d)(2)(viii)(C), which states that during a trial discharge to a parent, "the child is physically returned to the parent while the child remains in the care and custody of the local social services district." *See* Resp't's FOFCOL, Conclusions of Law ¶¶ 28, 29.

In a subsequent letter to the Court, however, the Government stated that it "respectfully asks the Court to disregard these citations," because these statutes were not in effect at the relevant time, *i.e.*, when Santana's mother naturalized in 2003. Resp't Letter, June 27, 2026, ECF No. 91; *cf. Duarte-Ceri*, 630 F.3d at 87 (holding that, in applying the CCA's naturalization requirements, courts look to "the law in effect when [the child] fulfilled the last requirement to qualify"). Neither statute had predecessor versions in effect when Santana's mother naturalized in 2003. The Government therefore disclaims reliance on these statutes, and accordingly, the Court will not consider them in its analysis. But even if it did, the Court notes that while these Family Court Act provisions use the terms "custody" or "care and custody," neither uses the term "*legal* custody" specifically. *See* N.Y. Fam. Ct. Act §§ 657, 1089(d)(2)(viii)(C) (McKinney 2026). And while both statutes indicate that a foster care placement vests some decision-making authority in the State, neither suggests that a parent loses all such authority.[12]

[12] The Court notes that the current version of N.Y. Educ. Law § 3244, which was not in effect when Ms. de la Rosa naturalized, indicates that the State has some decision-making authority over the education of a child in foster care, providing that, for such children,

> the social services district, in consultation with the appropriate local educational agency or agencies, shall designate either the school district of origin or the school district of residence within which the child in foster care shall be entitled to attend in accordance with a best interest determination made by the applicable social services district or voluntary authorized agency . . . .

N.Y. Educ. Law § 3244 (McKinney 2026). This provision became effective in 2018; the prior version of the statute was repealed in 1947 and was unrelated. 1947 N.Y. Sess. Laws ch. 501 (McKinney). The Court does not consider this provision persuasive for the same reasons that it does not rely on the Family Court Act provisions cited above: it post-dates the relevant time period,

The Government also cites two provisions of the New York Social Services Law: Section 358-a(3)(A), which states that, upon granting voluntary placement of a child in foster care based on a determination "that the best interests and welfare of the child would be promoted by removal of the child from [their] home," the court shall "transfer . . . custody and guardianship or care and custody of such child to such social services official";[13] and Section 383, which provides that "[t]he custody of a child placed" in foster care "shall be vested . . . in the authorized agency placing out or boarding out such child." Like the Family Court Act provisions cited above, these provisions use the terms "custody" and "care and custody," but not the term "*legal* custody" specifically. Neither statute states that a parent *loses* legal custody or decision-making authority when a child is placed in foster care. And interestingly, although they do not have the force of law, the Editor's Notes to the version of New York Social Services Law § 358-a in effect when Sanatana's mother naturalized[14] states that "[t]his transfer of care and custody is not to be confused with the transfer of the *legal* care and custody and guardianship of the child which would free the child for adoption

---

which, as the Government acknowledges, renders it inapt, and it does not say that a parent *loses* decision-making authority over the education of a child in foster care.

[13] The current version of New York Social Services Law § 358-a contains a provision, subsection (3)(g)(ii), that refers to a child in foster care as "a child whose legal custody was transferred to the commissioner of a local social services district in accordance with this section." Notably, this provision was not in effect when Santana's mother naturalized, *see* N.Y. Soc. Serv. Law § 358-a (McKinney 2002), and therefore the Government may not rely on it for the same reasons that it disclaimed reliance on the Family Court Act provisions originally cited in its Proposed Findings of Fact and Conclusions of Law. In any event, this provision is a rare example of one that uses the term "legal custody" in describing the relationship between a child in foster care and the State. But while the Court agrees that the State has some decision-making authority with respect to a child in foster care and thus has some "legal custody," it does not necessarily follow that a parent in turn *loses* legal custody under New York Law.

[14] *See* N.Y. Soc. Serv. Law § 358-a (McKinney 2002). This version of the statute was in effect from April 1, 2002, to November 20, 2005. *Cf. Duarte-Ceri*, 630 F.3d at 87.

pursuant to Section 384-b of the Social Services Law." Joseph R. Carrieri, Practice Commentaries, N.Y. Soc. Serv. Law § 358-a (McKinney 2002) (emphasis added).

Finally, although not cited by the Government in its Proposed Findings of Fact and Conclusions of Law, some New York caselaw uses the term "legal custody" to describe the relationship between the State and a child in foster care. But these cases are of limited utility here because they arise in inapposite contexts and do not purport to answer the question presented in this case. For example, in *Matter of Michael B.*, the New York Court of Appeals stated that "[l]egal custody of a child in foster care remains with the agency that places the child, not with the foster parents." 80 N.Y.2d 299, 309 (N.Y. 1992) (citing N.Y. Soc. Serv. Law § 383(2) (McKinney 1990)). But the question presented in *Michael B.* was whether a *foster* parent has legal custody of a child in their care, not whether a *biological* parent of such a child retains legal custody.

Similarly, in a case the Government cites in its supplemental letter disclaiming reliance on recently-enacted statutes that were not yet in effect when Santana's mother naturalized, *see* Resp't Letter, June 27, 2026, the New York Court of Appeals stated that, "[b]y assuming legal custody over the foster child, the applicable government official steps in as the sole legal authority responsible for determining who has daily control over the child's life." *Weisbrod-Moore v. Cayuga Cnty.*, 44 N.Y.3d 187, 193-94 (2025). But the question in that case was only whether a social services agency can be held liable for negligence when a child in foster care suffers abuse at the hands of a foster parent. *Id.* at 190-91. And while *Weisbrod-Moore* states that the State has "sole legal authority for determining who has daily control over the child's life," this refers to the State's authority to delegate "daily" caregiving decisions—that is, the rights and responsibilities that *Khalid* determined are part of *physical*, not legal, custody. *Id.* at 193-94; *see Khalid*, 904 F.3d

at 134. *Weisbrod-Moore* does not say anything about whether a parent of a child in foster care loses decision-making authority over the issues that characterize *legal* custody.

Ultimately, the Court cannot rely on the statutes and cases described above because to do so would focus too much on nomenclature, rather than on the substance of what matters in assessing legal custody: decision-making authority. *Cf. J.R.*, 55 N.Y.S.3d at 879 ("[J]oint custody is basically just a title, as are all custodial designations, with decision-making being the mechanism that actually guides the parenting process."). Ultimately, the authorities cited above indicate that under New York law, the State gains some decision-making authority over a child in foster care, but none stand for the proposition that a parent in turn loses all decision-making authority over important matters. The authorities accordingly do not support the proposition that a parent loses "legal custody," for purposes of the CCA, of a child under a voluntary foster care placement in New York.

* * *

Thus, while the State undoubtedly held a substantial degree of authority to make important decisions about Santana's life while he was in foster care, so too did his mother. Neither had sole decision-making authority, and so neither held sole "legal custody" of him at the exclusion of the other. Rather, when a child is voluntarily placed in foster care in New York, it appears to the Court that both the State and the parent hold substantial "authority to make significant decisions on [the] child's behalf, including decisions about education, religious training, and healthcare." *Custody*, Black's Law Dictionary. Both, then, appear to have had some degree of "legal custody" of Santana.

The analysis does not end there, however. In *Khalid*, the Second Circuit determined that "[b]oth [sides'] arguments" regarding the meaning of the term "physical custody" "find some

support in state law, and as a result," concluded that it could "not find state law conclusive in defining that term." 904 F.3d at 134. In *Khalid*, the parties disagreed about the meaning of "physical custody" under state law. Here, the parties agree that "legal custody" refers primarily to "decision-making authority" over important aspects of a child's life. *See* Pet'r's FOFCOL, Conclusions of Law ¶ 11; Resp't's FOFCOL, Conclusions of Law ¶ 19. Although Ms. de la Rosa retained some decision-making authority over Santana while he was in foster care, New York law does not conclusively answer whether the degree of decision-making authority that Ms. de la Rosa retained satisfies the CCA's "legal custody" requirement as a matter of federal law. And so, following *Khalid*, the Court now "turn[s] to other indicators of the statute's meaning to help construe and apply that term in this case," including "the broader statutory context" and "canons of statutory interpretation." *Khalid*, 904 F.3d at 135, 138.

## IV. The Statutory Context and History of the CCA

In considering the "broader statutory context" of the CCA, the Second Circuit in *Khalid* explained that the Act "significantly amended the derivative citizenship statute by 'liberaliz[ing] the Immigration and Nationality Act's conditions for the automatic derivative naturalization of alien children of United States-born or naturalized parents.'" 904 F.3d at 135 (quoting *Drakes v. Ashcroft*, 323 F.3d 189, 190 (2d Cir. 2003) (per curiam)). The CCA did so in part "by requiring that only one of [a child's] parents naturalizes," "while still ensuring a connection between the naturalizing parent and child." *Id.* at 136. Under the prior version of the statute, if a child's parents were not legally separated, *both* parents had to naturalize before the child could obtain derivative citizenship. *See id.* With separated parents, "the [prior] statute granted citizenship to the child so long as the child was in the 'legal custody' of [a single] naturalizing parent." *Id.* The CCA changed this bifurcated rule to allow a child to obtain derivative citizenship when only one parent naturalizes, whether the child's parents are separated or not. *Id.* However, the amended CCA

requires that the naturalizing parent have both "physical custody" and "legal custody" of the child, thereby ensuring that in all cases, "the child's 'real interests' are in the United States because of the child's strong connection to the naturalizing parent." *Id.* at 135-36 (quoting *Duarte-Ceri*, 30 F.3d at 90). Thus, the CCA liberalized naturalization while carrying forward "Congress's demand that the child ha[ve] a strong connection to the United States to acquire derivative citizenship." *Id.* at 138. "[W]hile the statutory context and history do[] not resolve all the textual ambiguities" of the CCA, they "do[] make clear that Congress intended to ensure a child's connection to the naturalizing parent." *Id.*

As to the facts, the Circuit observed that there was "no dispute that Khalid had such a connection to his United States citizen father at the time Khalid's father naturalized," as he "had lived at home with his parents since entering the United States." *Id.* Similarly, here, Santana lived with his mother for much of his life. Although he was subject to a foster care placement agreement for around seven years, he actually resided with his mother for approximately three of those years—for about half a year during his first trial discharge from August 1999 to March 2000, and then for about another two-and-a-half years during his second trial discharge from January 2001 to June 2003. *See* Stip. Facts ¶¶ 21-22, 24-26. While Santana lived with his mother, she clearly held decision-making authority over him. Even during the periods in which Santana did not physically reside with Ms. de la Rosa, she maintained substantial decision-making authority, including over religion, education, and major medical treatment. Accordingly, as in *Khalid*, Santana maintained a strong connection to his mother, such that his "acquisition of derivative citizenship does not violate Congress's demand that the child ha[ve] a strong connection to the United States . . . ." *Khalid*, 904 F.3d at 138.

Moreover, in *Khalid*, in assessing whether juvenile pretrial detention deprived the petitioner's father of physical custody, the Circuit noted that with "the Juvenile and Delinquency Prevention Act of 1974 ("JDPA") . . . Congress expresse[d] a clear preference for preserving the juvenile's connection to his or her family and the family's continued involvement in the juvenile's life during the period of federal pretrial detention." *Id.* at 139. In light of this, the Circuit reasoned that to hold that pretrial juvenile detention severs a child's connection to his family for purposes of custodial status would be inconsistent with the CCA's purpose. *See id.* Similarly, here, the voluntary foster care placement system in New York is intended to assist "[p]arents in temporary crisis," *Michael B.*, 80 N.Y.2d at 309 (citing N.Y. Soc. Serv. L. § 384-a (McKinney 1990)), by allowing parents to "enjoy the benefits of a voluntary state-subsidized program while they retain the right to dictate how the service should be administered." *Joyner by Lowry v. Dumpson*, 712 F.2d 770, 778-80 (2d Cir. 1983). And despite the fact that Santana's foster care placement lasted for several years, it was always meant to be temporary, and the goal of the State and the Family Court was always to return Santana to his mother. *See* DX-13_001 (1998 UCR Risk Reassessment); JX-14_003 (Petition, July 12, 1999); JX-16_003 (Petition, Sept. 12, 2000); JX-17_002–03 (Order, Oct. 31, 2000); JX-18_005 (Petition, Jan. 8, 2002); JX-19_002–03 (Order, Apr. 22, 2002); JX-20_003 (Petition, Mar. 28, 2003); JX-21_002 (Order, May 6, 2003). Notably, while *Khalid* held that temporary pretrial detention—although potentially lasting for a significant period of time[15]—does not sever a parent's physical custody of a child, the Second Circuit has held, in

[15] Khalid was apparently in pretrial detention for a lengthy period of time. He was arrested in July 2011, *see Khalid*, 904 F.3d at 130, but did not plead guilty until May 2012 and was not sentenced until April 2014, *see* Maryland Man Sentenced For Conspiracy To Provide Material Support To Terrorists, U.S. Att'y's Off., E. Dist. Pa. (May 14, 2014), https://www.justice.gov/usao-edpa/pr/maryland-man-sentenced-conspiracy-provide-material-support-terrorists.

contrast, that a lengthy felony prison sentence "permanently separate[s] [a minor] from his parents' care" and thereby deprives the parents of "physical custody" under the CCA. *Mullins Cruz. v. Garland*, No. 22-6290-ag, 2024 WL 1107839, at *3 (2d Cir. Mar. 14, 2024) (summary order). In terms of the nature of the separation between parent and child, it makes sense to treat voluntary placement in foster care as more like pretrial detention than a felony sentence.

Accordingly, just as the Second Circuit in *Khalid* concluded that it would be consistent with the history and purpose of the CCA to hold that the petitioner's temporary pretrial detention did not remove him from the "physical custody" of his parent, *see Khalid*, 904 F.3d at 135-38, here, the Court similarly concludes that it is consistent with the purpose of the Act to hold that Santana's foster care placement—which was always meant to be temporary and which left his mother with a substantial degree of decision-making authority—did not remove him from her "legal custody." While the CCA's context "does not resolve all the textual ambiguities," *id.* at 138, it weighs in favor of Santana's position in this case. *See Barbosa da Cunha v. Freden*, 175 F.4th 61, 71 (2d Cir. 2026) (first quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024); and then quoting *Abramski v. United States*, 573 U.S. 169, 179 (2014)) (stating that federal courts "interpret statutes 'based on the traditional tools of statutory construction,'" beginning with the text, and analyze "the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose").

## V. Interpretive Canons

Finally, the Court follows *Khalid*'s guidance to consider two interpretative canons. The first is that the derivative citizenship statute "promotes Congress's remedial purposes of keep[ing] families intact." 904 F.3d at 138 (quoting *Duarte-Ceri*, 630 F.3d at 90). The second is that "there is a 'long-standing presumption' that in 'the immigration context,' we construe 'any lingering ambiguities' in favor of the petitioner." *Id.* (quoting *Duarte-Ceri*, 630 F.3d at 89). The

Government argues the opposite, contending that "doubts regarding an applicant's eligibility for naturalization should be resolved in favor of the United States." Resp't's FOFCOL, Conclusions of Law ¶ 3 (citing *Berenyi v. Dist. Dir., Immigr. & Naturalization Serv.*, 385 U.S. 630, 637 (1967)). But the Second Circuit rejected this exact argument in *Khalid*, noting that "[t]he presumption the government cites . . . applies to *evidentiary* burdens, and does not dictate how we must resolve the 'lingering ambiguities' that exist when interpreting a citizenship statute." 904 F.3d at 138-39 (emphasis in original) (citing *Gil v. Sessions*, 851 F.3d 184, 188 (2d Cir. 2017)). Here, both canons weigh in favor of finding that Santana's foster care placement did not deprive his mother of "legal custody" for purposes of the CCA. Such a holding is consistent with Congress's "remedial purposes of keep[ing] families intact," *Khalid*, 904 F.3d at 138, and with the presumption that legal ambiguities in the immigration statutes should be resolved in favor of the petitioner.

* * *

Throughout its Proposed Findings of Fact and Conclusions of Law, the Government suggests that the State had more decision-making authority over Santana than Ms. de la Rosa. *See* Resp't's FOFCOL, Conclusions of Law ¶¶ 19, 20, 25, 27, 29, 31. Even if this were true, the CCA does not say that a naturalizing parent must be the only person (or entity) with legal custody. It requires only that the naturalizing parent have "legal custody" (as well as physical custody) over the child. 8 U.S.C. § 1431(a). Indeed, the CCA's implementing regulations provided that the Government would recognize derivative citizenship in cases where more than one person had "legal custody" under the relevant state law. *See* 8 C.F.R. § 320.1(2) (2003) ("The [Government] will consider a U.S. citizen parent who has been awarded 'joint custody,' to have legal custody of a child. There may be other factual circumstances under which the [Government] will find the U.S. citizen parent to have legal custody for purposes of the CCA.").

It is worth noting that, in *Khalid*, the petitioner was held in pretrial detention and the Government obviously exercised a great deal of control with respect to the day-to-day care of the petitioner—certainly more than his father did. *See* 904 F.3d at 131 (recounting facts of Khalid's pretrial detention). It would be hard to say that the Government lacked "physical custody" of him. But, for purposes of construing the CCA, the Second Circuit did not consider the Government's physical custody to be mutually exclusive with that of the petitioner's father. *See id.* at 141. The Court reaches an analogous conclusion here. The State had substantial decision-making authority over Santana while he was in foster care. But it does not necessarily follow that this wholly deprived Ms. de la Rosa, who simultaneously retained her own significant decision-making authority over Santana, of "legal custody." The point is that "physical custody" and "legal custody" do not appear to imply mutual exclusivity between the State and a parent, at least for purposes of construing the CCA. The Court need not determine the outer limits of "legal custody," that is, when a parent's loss of decision-making authority may be so substantial as to effectively terminate their "legal custody" for purposes of the Act. It is enough to determine that here, Ms. de la Rosa continued to exercise enough decision-making authority over "the important issues, such as religious training, education and medical care," *Trapp*, 526 N.Y.S.2d at 97, to retain "legal custody" of Santana under the CCA.

Finally, the Government repeatedly emphasizes that Ms. de la Rosa had numerous parenting challenges, that she was unable to control Santana, and that the two trial discharges to her home "failed" (although the second one was never discontinued and ultimately lasted approximately 2.5 years). *See* Resp't's FOFCOL, Conclusions of Law ¶¶ 20-27. Broadly speaking, however, "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model

parents . . . ." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). That Ms. de la Rosa experienced profound difficulties while raising Santana does not mean her rights with respect to Santana's upbringing, including decision-making authority over certain issues, "evaporate[d]." *Id.* And the Court cannot accept the underlying premise of the Government's argument, which seems to be a suggestion that the quality of a person's parenting of a troubled child diminishes the child's ability to derive citizenship. This notion lacks any basis in the statutory text and is contrary to the statutory history and the relevant canons of construction.

**CONCLUSION**

Following the Second Circuit's guidance in *Khalid*, the Court has analyzed the CCA's text as illuminated by the relevant state law principles, considered the CCA's history and context, and applied the relevant interpretative canons. The Court concludes that Ms. de la Rosa's voluntary agreement to place Santana in foster care and the New York Family Court's orders approving that placement and its continuation did not prevent Santana from satisfying the "legal custody" requirement of the CCA. The Court therefore concludes that Santana has provided sufficient evidence to establish that he meets the statutory requirements for derivative citizenship.

The Clerk of Court shall transfer this matter as a Petition for Review to the Second Circuit and close this case.

SO ORDERED.

Dated: October 27, 2026
New York, New York

DALE E. HO
United States District Judge